UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BRENT OSTER, | Case No:  C 09-00851  SBA |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| STANDARD INSURANCE COMPANY; THE LUCASFILM LTD. GROUP LONG TERM DISABILITY PLAN, | **REDACTED** |
| Defendants. | |

Plaintiff Brent Oster ("Oster") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., seeking long term disability benefits under the terms of Defendants' long term disability plan.  The parties are presently before the Court on cross-motions for judgment under Federal Rule of Civil Procedure 52.  Dkts. 29, 66.  After consideration of the parties' briefs, the evidence in the Administrative Record, and the extrinsic evidence offered by Plaintiff on the issue of Defendant Standard Insurance Company's ("Standard") conflict of interest, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### A.   OSTER'S OCCUPATION

1.      Oster holds a degree in Aerospace Engineering from the University of Toronto and trained as a fighter pilot with the Canadian Armed Forces.  Administrative Record ("AR") 00484-485.

2.      For nearly ten years, Oster worked continuously as a computer, graphics, and game programmer, and co-founded two companies.  Id.  In August 2001, Oster began working as an Engineering Technical Director for LucasArts LLC.  Id.  At LucasArts, Oster supervised

and assisted the design and development of computer games.  Id. 00482, 00484-485.  The

Technical Director position required long hours and a high level of cognitive functioning.  Id.

00482.

**B.     THE STANDARD POLICY**

3.     As a LucasArts employee, Oster was enrolled in his employer's long term

disability plan ("Plan"), which was insured under a group Long Term Disability ("LTD")

Insurance Policy No. 638213-T ("Policy") issued by Standard to Lucasfilm Ltd.  Id. 00001-38.

The Policy became effective on April 1, 2004.  Id. 00012.  Standard both administers disability

claims under the Plan and pays benefits according to the terms of the Policy.  Id. 00018, 00033.

4.     The "Allocation of Authority" section of the Policy states that Standard has full

authority to administer claims:  "[Standard has] full and exclusive authority to control and

manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve

all questions arising in the administration, interpretation, and application of the Group Policy."

Id. 00033.

5.     The Policy specifically enumerates that:

Our authority includes, but is not limited to:

(1)  the right to resolve all matters when a review has been requested;

(2)  the right to establish and enforce rules and procedures for the
administration of the Group Policy and any claim under it;

(3)  the right to determine:

(a)  eligibility for insurance;

(b)  entitlement to benefits;

(c)  the amount of benefits payable; and

(d)  the sufficiency and the amount of the information we may
reasonably require to terminate a, b, or c above.

Id.  The Allocation of Authority provision concludes:  "[s]ubject to the review procedures of

the Group Policy, any decision we make in the exercise of our authority is conclusive and

binding."  Id.

6.      The Policy states that Oster is entitled to receive disability benefits after a 90-day elimination period if he is unable to:  1) perform with reasonable continuity the "Material Duties" of his own occupation; and 2) suffered a loss of 20% in his indexed predisability earnings when working in his "Own Occupation."  Id. 00021.  The Policy defines Material Duties as the "essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted."  Id.  The Policy defines "Own Occupation" as "any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation your are regularly performing for your Employer when Disability begins."  Id.

7.      If the claimant finds a new occupation, the claimant "will no longer be Disabled when [his] Work earnings from another occupation meet or exceed 80% of [his] Indexed Predisability Earnings."  Id.

8.      The Policy has a maximum benefit period running to age 65 and pays 60% of a claimant's predisability earnings.  Id. 00016.  When Oster left LucasArts, he was making $10,937.46 per month in pre-disability earnings (or $132,249.56 per year), which means he is potentially eligible for $6,562.48 in monthly disability benefits.  Id. 00469.

9.      The Policy provides for certain offsets to the benefit payments that otherwise would be payable.  Id. 00025.  Offsets include, but are not limited to, social security benefits, severance pay, and earnings from an employer or self-employment.  Id. 00025-26.

10.     Coverage under the Policy terminates when a claimant is no longer employed by Lucasfilm Ltd., unless the claimant is already disabled.  Id. 00021.

11.     Under the Policy, if a claimant is already receiving benefits, his benefits automatically cease when any one of the following occur:  the claimant is "no longer disabled;" he becomes insured "under any other LTD plan;" or he "fail[s] to provide proof of continued Disability and entitlement to LTD benefits."  Id. 00024.

**C.      THE OCTOBER 20, 2003 ACCIDENT AND RELATED MEDICAL TREATMENT**

12.     On October 20, 2003, while stopped at a red light, Oster was rear-ended by a van traveling about 25 miles per hour.  Id. 00359-363.  The Traffic Collision Report confirms the absence of skid marks on the roadway, and the van's driver admitted he was not looking at the roadway but was, instead, looking for something that had fallen inside the van.  Id. 00359.  Oster suffered two impacts.  First, from behind, and second, when his car was pushed into the vehicle stopped in front of him.  Id. 00362.  The force of the collision tore Oster's driver's seat from its mounting, throwing Oster and his broken front seat into the back of his car.  Id. 00341.

13.     Oster refused immediate medical attention after the accident and walked home, which was two blocks away.  Id. 00341, 00603.  A short time later, Oster's wife returned home and took him to Novato Community Hospital.  Id. 00085.  The hospital noted that Oster was suffering from a mild headache and midline tenderness in his spine, but was otherwise alert and oriented.  Id.

14.     Oster was seen three additional times in the hospital emergency room for injuries he sustained in the accident:  (1) later the same night of the accident, after experiencing increased symptoms of headaches, nausea, vertigo and pain; (2) on October 25, 2003, due to the facial numbness, severe headaches, vertigo and nausea; and (3) on November 17, 2003, with vomiting, dizziness, headaches and blurred vision.  Id. 00069-72, 00075, 00080-85, 00091-92.  Steven Pyke, M.D., Oster's primary care physician, and J. Richard Medius, M.D., of Novato Community Hospital examined Oster and independently made diagnoses of "post-concussive disorder" and "vestibular concussion status post MVA," respectively.  Id. 00852-853.  After the November 17, 2003 visit at U.C. San Francisco Medical Center, Oster was referred for follow-up care with UCSF neurologists Neil Raskin, M.D., Anthony Kim, M.D., and Andrew Ahn, M.D., all of whom concluded that Mr. Oster was suffering from "post concussion syndrome with a posttraumatic migraine element producing the numbness and weakness of his left limbs."  Id. 00105, 00159.

15.     Oster missed work from the date of the accident through January 5, 2004.  Id. 000476.  Upon returning to work, Oster continued to experience severe headaches, and severe

pain in his upper back and neck.  Id. 00350-351.  He continued to experience vertigo, severe headaches, and left-sided numbness.  Id. 00159.  On January 21, 2004, Dr. Raskin again diagnosed Oster with post-concussion syndrome with a posttraumatic migraine element producing the numbness and weakness of his left limbs, "because the force involved in a concussive injury are focused at the brainstem and because the inherited disturbance of migraine is also in the brainstem."  Id. 00159.

16.     Lisa Hatt and Blaire Hughes of LucasArts confirmed that Oster "was really struggling by March [2004] to make it into work, and was having difficulty concentrating", that he "was only able to work 2 days per week for the last three weeks of March", and that he "was clearly having trouble performing the essential functions of his job."  Id. 00337-338.  Oster ceased working at LucasArts on April 7, 2004.  Id. 00339.

17.     Through a Standard "Long Term Disability Benefits Attending Physician's Statement," Dr. Pyke certified disability through November 1, 2004.  Id. 00191-192.   He referred Oster to Dr. Sponzilli, a Physical Rehab & Pain Specialist.  Id. 00192.  Dr. Sponzilli noted there was disc pathology at C5-6 and C6-7 with exam evidence of cervical facet syndrome as well as cervical radiculopathy involving the C6 dermatome.  Id. 00177-178.  Dr. Sponzilli's physical examination revealed a positive Spurling's test.  Id. 00174.  Dr. Sponzilli thus performed a cervical epidural injection on June 24, 2004 that was interrupted by a vagal episode.  Id. 00173.  The procedure was not completed.  Id.

18.     On August 26, 2004, Oster received treatment at Kentfield Rehabilitation Center with Dr. Doherty, a physiatrist.  Id. 00810-811.  An initial assessment revealed cognitive difficulties with reasoning and short term memory.  Id.

19.     Medical records indicate that sometime between July and October 2004, Oster's primary care physician, Dr. Pyke, diagnosed Oster as depressed.  Id. 01024.  Dr. Michael Freeman, one of Plaintiff's psychiatrists, opined that the "acute onset" of depression resulted from pain, inactivity, financial stressors and marital strife, all of which Dr. Freeman traced back to the accident.  Id. 01024, 01019.  Dr. Pyke, noting the onset of depression, and not aware that Oster had previously been diagnosed with bipolar disorder, prescribed Effexor, an

1   antidepressant.  Id. 01019.  Effexor, however, converted Oster's depression to mania, and he

2   thus began to experience an acute onset of a severe manic episode for which he was ultimately

3   hospitalized on November 3, 2004.  Id. 01021.  After that episode, Plaintiff continued ongoing

4   psychiatric/pharmaceutical treatment with Dr. Michael Freeman.  Id. 00674.

5       20.    Oster was examined by neurosurgeon Archimedes Ramirez, M.D., on December

6   7, 2004.  Id. 01027-1032.  Oster continued to complain of back and neck pain, paraesthesia of

7   his left face, arm and leg and episodic seizures.  Id.   Dr. Ramirez made the following

8   assessment:  "1) this patient was doing well, except for a pre-existing compensated bipolar

9   mental problem.  He had an active life until he was involved in a rear-end motor vehicle

10  accident and sustained a traumatic brain injury, manifested by post-cerebral-concussion

11  syndrome.  This patient's head injury is manifested by post-traumatic headaches, partial seizure

12  disorder, and aggravation of his bipolar mental problem; 2) chronic back & left leg pain due to

13  bulging discs at L4-5 and L5-S1; 3) Chronic cervical thoracic, and lumbosacral strain.  All of

14  the above injuries are secondary to the accident on 10/20/2003."  Id. 01032.  Dr. Ramirez

15  concurred that Oster "is fully disabled because of the traumatic brain injury" and recommended

16  that he continue treatment with his existing providers.  Id. 01032.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**D.     OSTER'S DISABILITY CLAIM AND STANDARD'S INITIAL DENIAL[1]**

21.     Oster applied for long term disability benefits under the Standard policy on July 23, 2004.  AR 00476-478.  He stated his disability periods as being "10/20/03-1/5/04 [and] 4/7/04 to Present."  Id. 00476.

22.     Standard employed a physician consultant, neurologist Dr. Dickerman, to review the medical records that Oster submitted with his claim.  Id. 00790-794.  In his November 22, 2004 report, Dr. Dickerman disagreed with the post-concussion syndrome diagnosis.  Id. 00790-794.  Dr. Dickerman also asserted that Oster could not have suffered a concussion without a loss of consciousness, even though medical literature Oster submitted to Standard indicates that a concussion does not have to involve loss of consciousness to cause trauma.  Id. 00984-985, 00992, 01002, 01009.

---

[1] A district court may admit evidence outside of the record on the issue of the "nature, extent and effect" of any administrator's conflict of interest.  Abatie v. Alta Health and Life Ins. Inc., 458 F.3d 955 (9th Cir. 2006).  The Court finds the evidence offered by Plaintiff – the documents showing Standard compensation to Dr. Dickerman, Dr. Toenniessen, and United Review Services, as well as Standard's claim manual – to be relevant to this issue. Dkt. 31, Kim Decl., Exs. A-G.  Those documents referred to in these Findings are admitted into evidence.  However, Plaintiff's Motion for Leave of Court to supplement the administrative record to include recent medical reports due to "procedural irregularities" in Standard's claim administration (Dkt. 73) is DENIED.  As indicated below, Standard's administration of Plaintiff's claim for long term disability benefits is reviewed for an abuse of discretion.  In applying the abuse of discretion standard, the district court generally should exclude evidence outside the administrative record.  See Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1027 (9th Cir. 2008) ("It is the general rule, of course, that when applying an abuse of discretion standard to an ERISA plan, the district court's review is limited to the administrative record.").  This general rule was qualified in Abatie, which held that district courts may take additional evidence whenever "[procedural] irregularities have prevented full development of the administrative record."  See Saffon v. Wells Fargo Co. Long Term Disability Plan, 522 F.3d 863, 872 n.2 (9th Cir. 2008) (quoting Abatie, 458 F.3d at 973).  Standard's failure to address the specific medical reports as issue here is not a procedural irregularity. The medical reports Plaintiff seeks to admit as evidence were generated between August 24, 2009 and January 31, 2010.  See Dkt. 73-1, Oster Decl. ¶¶ 2-4.  As indicated below, Standard issued its final determination letter on August 5, 2008.  AR 01588.  These recent medical reports were not excluded from Standard's administration of the claim due to any procedural error because they did not exist at the time of the administrative determination.  See Patrick v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 638 F. Supp. 2d 1195, 1209 (S.D. Cal. 2009) ("because the additional medical reports and materials submitted by Plaintiff did not exist at the time of VPA's denial of her appeal, these documents could not have been excluded from the claim file due to procedural irregularities").

23.     Dr. Dickerman ultimately found that "the medical information would support limitations and restrictions from sedentary work activity from 10/20/2003 to… 11/17/2003.  I see no indication…. that would have prevented him from continuing to perform his sedentary work activities from about late 11/2003."  Id.  00793.  Dr. Dickerman concluded that "the patient has never had restrictions from physical disease point of view that has prevented him from performing full-time sedentary level physical work."  Id.

24.     On December 2, 2004, Standard issued a denial letter, relying on reasons set forth in Dr. Dickerman's report.  Id. 00298-301.  Standard based its denial, first, on that ground that the injury was pre-existing to Oster's claim, and, second, on the ground that there was insufficient medical evidence of disability.  Id.

**E.     OSTER'S APPEAL**

25.     On May 25, 2005, Oster appealed the denial, submitting evidence of his asserted disability from his treating physicians, and literature on post-concussion syndrome and brainstem injury.  Id. 00982-1071.  Oster also asserted in his appeal that Dr. Dickerman had a record of bias in favor of insurers, including Standard, when evaluating the medical conditions of disability claimants.  Id. 01033-1071.  The appeal also included a January 2, 2005 psychiatric evaluation by psychiatrist Dr. Freeman, performed after Oster was released from the hospital for his manic episode.  Id. 01018-1025.  Dr. Freeman found Oster to be "hypomanic with insomnia, racing thoughts, intrusive communication, irritability, [and] eccentric thinking."  Id. 01022.  Dr. Freeman found that it was likely that the automobile accident triggered the onset of Oster's depression and manic symptoms, given the pain and physical limitations caused by the accident.  Id. 01024.

26.     Standard used Dr. Dickerman for another medical review in response to Oster's appeal.  Dr. Dickerman again opined in a report dated June 22, 2005 that post-concussive syndrome required a loss of consciousness that he did not find present for Oster.  Id. 00929.  Dr. Dickerman asserted that Oster could perform a sedentary or light duty job, without considering or discussing the specific cognitive demands of his position at LucasArts.  Id. 00930.

27.     Standard also solicited the medical records review of a psychiatrist, Linda Toenniessen, M.D., who submitted a report on July 11, 2005.  Id. 00921-00924.  Dr. Toenniessen claimed she did not know if Oster's bipolar disorder, as retriggered by his post-concussive disorder, disabled him from his job, despite the evidence Oster submitted from Dr. Freeman that the disorder was and continued to be disabling.  Id. 00922-923, 01018-1025.

28.     Standard agreed to pay Dr. Dickerman to perform medical record reviews for ten hours a week at the rate of $200.00 per hour.  Dkt. 31, Kim Decl., Exh. B 04195-4196. Starting March 1, 2005, Dickerman's hourly rate was increased to $225.00 per hour.  Id. 04200-4201.  Moreover, Standard paid Dr. Dickerman $172,300.00 in 2003, $222,600.00 in 2004, $182,107.50 in 2005, and $219,150.50 in 2006.  Id. Exh. A 04190-4193.

29.     On March 1, 2005, Standard agreed to pay Dr. Toenniessen $160.00 per hour to perform medical record reviews for four hours a week.  Id. Exh. C 04204-4205.  Starting January 1, 2006, Dr. Toenniessen was paid $165.00 per hour.  Id. 04208.  Standard paid Dr. Toenniessen $42,833.00 in 2004, $44,402.50 in 2005, and $39,276.25 in 2006.  Id. Exh. D 04210-4214.

30.     From 2004 through 2006, Standard paid United Review Services $397,255.01 to arrange for disability reviews, including Independent Medical Evaluations.  Id. Exs. F, G.

F.      **THE INDEPENDENT MEDICAL EXAMINATION ON APPEAL**

31.     On January 16, 2006, Plaintiff began employment with Radical Entertainment ("Radical") in Vancouver, Canada, as a Technical Director.  AR 01444.  Oster started with a yearly salary of $110,000 in Canadian dollars ("CDN") ($95,700 in United States dollars ("USD")), which was later reduced due to performance issues to $90,000 CDN ($78,300 USD). Id. 02597, 02631.  During his employment at Radical, Oster was entitled to a reduced benefit under the policy's Return to Work Provisions, because he made less than 80% of his predisability salary at LucasArts.  Id. 00022, 00469.

32.     As part of the appeal, Standard asked Oster to submit to an "Independent Medical Examination" by a neuropsychologist through Standard's vendor United Review Services.  Id. 00754-00757.  On March 20, 2006, Oster underwent an IME with

neuropsychologist Dr. William J. McMullen.  After the exam, Dr. McMullen told United Review Services that he needed previous neuropsychological, psychological, and psychiatric testing of Oster, because Oster was "no longer alleging CURRENT disability – he is back to work."  Id. 00685. Dr. McMullen characterized Oster as "fighting for disability" for the period after the motor vehicle accident.  Id.

33.     In his subsequent report, submitted to Standard on April 26, 2006, Dr. McMullen found that Oster's performance on a test requiring rapid processing speed was a "significant weakness."  Id. 00656, 00657-658.  Oster's processing speed was the same as it was when he was tested by clinical psychologist Jennifer M. Duffy, Ph.D. in 2005.  Id. 00678.  Dr. McMullen also indicated that Oster's reading recognition, and spelling and math achievement, were weaker than anticipated based on Oster's high IQ, and lower than the results reported by Dr. Duffy when she tested Oster in May 2005.  Id. 00657.  Dr. McMullen also acknowledged that Oster's score for attention and concentration was weaker than it had been when he had been tested by Dr. Duffy in 2005.  Id. 00664, 00679.  Dr. McMullen admitted this was a cause for "some concern."  Id. 00665.  Dr. McMullen agreed that Oster was in fact disabled from his own occupation from July 7, 2004 to May 31, 2005.  Id. 00667-669.

34.     However, Dr. McMullen concluded that, because Oster found employment with Radical in January 2006, he was no longer disabled from his condition after May 2005.  Id. 00645, 00669.  Dr. McMullen made this conclusion without discussing the salary or job demands of Oster's position at Radical, and despite admitting that Oster's personality was such that he minimized problems and the effects that such problems have had upon his life and the lives of others.  Id. 00659.  Also, Dr. McMullen opined that that the negative effects of Oster's post-concussion syndrome lasted only three months, because nearly 100% of individuals in sports concussion cases made a full recovery.  Id. 00664.

G.     DETAILS OF OSTER'S UNSUCCESSFUL RETURN TO WORK

35.     Standard received a copy of McMullen's IME report on April 26, 2006, but did not provide a copy to Oster until three weeks later, despite repeated requests by Oster's

counsel.  Id. 01463, 01466, 01480.  At the time, Standard did not provide to Oster the raw data underlying Dr. McMullen's report.  Id.

36.     Before Standard had provided the report, Oster's counsel informed Standard that Oster's condition had made it impossible for him to perform his position at Radical on a full-time basis, resulting in a demotion, and ultimately termination.  Id. 01480, 01482, 02662-2663, 02665-2669.

37.     On April 19, 2006, Oster disclosed to his supervisors his difficulties in performing his job at Radical due to his condition, and requested an accommodation.  Id. 02629-2630.  In May 2006, Oster was demoted to the position of Senior Programmer.  Id. 02628, 02631-2632.  Oster was unable to perform the duties of his reduced position, and he was terminated effective June 28, 2006.  Id. 02636-2637.[2]

38.     On August 8, 2006, Oster's counsel submitted to Standard the sworn statement of Oster's former supervisor at Radical, Rod Davison.  AR 01444-1445.  In that statement, Mr. Davison indicates that Plaintiff started taking vacation time immediately "to disguise his inability to physically cope with a regular work schedule … in retrospect, I realize that Mr. Oster pushed himself very hard to be successful during his first few weeks, but he was unable to sustain such effort."  Id. 01444.  Mr. Davidson further states that Oster was "unable to concentrate on the tasks he was required to perform" and suffered from fatigue.  Id.  He observes that "[o]n multiple occasions I found him asleep at his desk."  Id.  Mr. Davidson explains that, after a three-month probation period, Oster was demoted to the position of Senior Programmer in April 2006; however, Oster's work continued to be unsatisfactory, as it took him "approximately one week to write a piece of code that should not have taken more than four hours to compose."  Id.

---

[2] In Oster's Proposed Findings of Fact and Conclusions of Law, submitted in support of his motion, Oster indicates, without reference to any supporting declaration, that he began work at Nvidia Corporation on April 1, 2008 as a Technical Support employee.  Dkt. 89 ¶ 59. In addition, while Oster initially moved for payment of benefits from July 7, 2004 to the present, Oster indicates in his proposed findings that he is seeking benefits from July 7, 2004 to April 1, 2008.  Due to this unexplained discrepancy, the Court requests further briefing from the parties on this issue, as indicated below.

39.     Moreover, Standard failed to follow its own claims manual by not investigating whether Oster remained disabled after he started working for Radical. ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████████ There is no indication from the record that Standard followed these procedures, despite its acceptance of Dr. McMullen's assertion Oster was not disabled because he was working again.  AR 00645, 00669.

**H.      DR. HORSTMAN'S REBUTTAL TO DR. MCMULLEN'S REPORT**

40.     Standard provided Oster with the raw data underlying Dr. Mullen's report on November 1, 2006, which was three months after Oster initially requested the data.  Id. 01288, 01314, 02665, 01120-1257.

41.     On December 18, 2006, Oster's counsel wrote Standard, indicating that Oster's medical reviewer would need additional time preparing a response to Dr. McMullen's report.  Id. 02577-2578.  Standard sent a letter to Oster the following day, asserting that Standard's decision to deny benefits under the own occupation definition was appropriate.  Id. 02581-02585.  That letter introduced a new reason for denying benefits, claiming that Oster did not prove he suffered a loss of 20% of his predisability earnings, notwithstanding the income documentation, including tax returns, that Oster's counsel provided.  Id.

42.     On February 14, 2007, Oster's counsel submitted to Standard a report from neuropsychologist Dr. William R. Horstman, who reviewed Dr. McMullen's report.  Id. 02261-2338.  Dr. Horstman opined that it was improper for Dr. McMullen to rely on the Dictionary of

Occupational Titles ("DOT") description for Program Manager (which was last revised in 1991) provided by Standard's vocational consultant, when Standard asked that consultant if Oster could perform the job of a Project Director.  Id. 02268-2269.  Rather, according to Dr. Horstman, Standard should have considered the more specific cognitive requirements of Oster's position.  Id. 02268-2272.

43.     Dr. Horstman disagreed with Dr. McMullen's reliance on a study tracking the cognitive effects of concussions in college football players, and noted that more recent and comprehensive literature indicated that patients with mild brain injury had difficulty returning to work due to cognitive deficits, including processing speed, even after a few years.  Id. 02272-2277.

44.     Dr. Horstman noted that neither Dr. McMullen nor Standard attempted to obtain any medical documents dated after 2005, or to contact Oster's treating physicians.  Id. 02280. 02282, 02317.  Dr. Horstman asserted that such procedures were a customary and normal practice for any IME, and were mandated by the Specialist Guidelines for Forensic Psychologists.  Id. 02280.  In response, Standard claims adjuster Christine Foster asserted that there was "no point to getting updated records when claim [sic] already old."  Id. 02279.

45.     Dr. Horstman criticized Dr. McMullen for relying on the computerized interpretation of the Personality Assessment Inventory test, which Dr. Horstman asserted is discouraged by the Standards for Education and Psychological Testing as potentially "grossly misleading," and which could lead to "faulty diagnostic and prognostic decisions, as well as mislead the trier of fact in judicial and governmental settings."  Id. 02284.  Dr. Horstman further opined that Dr. McMullen's refusal to administer the more detailed MMPI-2 test, which had been administered to Oster previously, was suspect.  Id. 02325, 2327.

46.     Dr. Horstman criticized Dr. McMullen for failing to administer a test of divided attention, in view of the fact that Dr. McMullen previously stated in his own publication that the lack of such a test would lead an examiner to "erroneously conclude that there is no evidence for neuropsychological impairment."  Id. 02285.  Dr. Horstman noted that Dr. McMullen asserted that he performed tests that were never described in the reported nor

1    included in the raw data provided.  Id. 02287.  Dr. Horstman asserted that Dr. McMullen also

2    overstated the amount of time he devoted to testing by claiming six hours of testing when he

3    only performed five hours.  Id. 02313-2314.

4         47.    Dr. Horstman criticized Dr. McMullen for relying on the Wisconsin Card

5    Sorting Test (WCST) to measure Oster's executive function, as Dr. Duffy had administered the

6    test previously, and Oster's prior knowledge of the test, made it of "no clinical utility and/or

7    reliability."  Id. 02291.  Dr. Horstman pointed out that Oster's performance on the test was

8    extremely low given Oster's high IQ and was evidence of cognitive decline.  Id. 02293.  Dr.

9    Horstman also asserted that Dr. McMullen's conclusion that Oster's did "very well" on these

10   tests was inaccurate.  Id. 02293-2295.

11        48.    Dr. Horstman observed that Dr. McMullen's measurement of Oster's percentile

12   ranking incorrectly failed to include years of education and age.  Id. 02296.  Dr. Horstman

13   asserted that, when correctly measured, Oster actually scored at the 2nd percentile on Digit-

14   Symbol Coding, which, according to Dr. Horstman, demonstrated a profound loss in Oster's

15   ability to multi-task (including visual scanning, sequencing, motor coordination and speed).  Id.

16   02298.  Dr. Horstman opined that Oster's errors in simple arithmetic portions of the exam for

17   someone of his high IQ and education demonstrated significant cognitive decline.  Id. 02300-

18   2302.

19        49.    Dr. Horstman criticized Dr. McMullen's attempt to blame Oster's decline in

20   processing speed solely on his use of Depakote as an assertion not supported by the literature.

21   Id. 02303-2304.  Moreover, Dr. Horstman disagreed with Dr. McMullen's conclusion that it

22   was Oster's fault that he suffered a manic episode after being prescribed Effexor.  Id. 02304-

23   2305.  Dr. Horstman concluded that Dr. McMullen's report contained numerous errors,

24   including:  "the sheer number of scoring errors, misrepresentation regarding tests administered,

25   attempts at denigrating [Oster's] psychiatrist's character and clinical ability."  Id. 02336.

26   Furthermore, Dr. Horstman concluded that Dr. McMullen had laid no foundation for the

27   definition of either disability or impairment.  Id.

28

50.     Four months after receiving Dr. Horstman's report, Standard's in-house physician, Dr. Gwinnell, recommended to Standard that Dr. McMullen provide a response.  Id. 02258.  In its request to Dr. McMullen to provide a response, Standard recognized that it had not previously asked Dr. McMullen to contact any of Oster's treating physicians as part of preparing his initial IME report, and indicated that "Dr. McMullen does not need to respond to those assertions."  Id. 02226.

51.     On October 16, 2007 – eight months after Standard received Dr. Horstman's report – Dr. McMullen submitted to Standard a response to Dr. Horstman's critiques.  Id. 02203-2210.  Dr. McMullen indicated that two tests he previously had represented were administered – the Ruff Figural Fluency Test and the Phrase Repetition Tests – were never given, and that these tests were listed in his report due to a clerical error.  Id. 02204.  Dr. McMullen also indicated that he had spent five hours testing Oster, rather than the six hours he had previously reported, which he again contributed to a clerical error.  Id. 02208.

I.  **ADDITIONAL INFORMATION PROVIDED TO STANDARD DURING THE APPEAL PROCESS**

52.     On October 5, 2006, Oster informed Standard that he was considered totally disabled by the Social Security Administration since 2004, provided records of state disability benefits received, and provided his 2003 through 2005 tax records.  Id. 01314-1347.

53.     On November 21, 2006, Oster disclosed to Standard employment records from his employment with Radical.  Id. 02597.

54.     On March 29, 2007, Oster disclosed to Standard his 2006 Canadian tax returns. Id. 02393-2394.

55.     On March 29, 2007, Oster submitted to Standard the transcripts of his attendance at the University of Santa Barbara Extension.  Id. 02389-2391.

56.     On April 9, 2007, Oster submitted an "Activities of Daily Living" form to Standard in relation to his claim.  Id. 02362-2368.  Oster reported that he continued to suffer from fatigue and pain at the base of skull and in his neck and back.  Id. 02363, 02367-2368. Oster reported that he was taking one class.  Id. 02367.  Oster also stated that his fiancée was

1   taking care of most the activities of daily living for him, including financial functions, because

2   his condition made him unable to handle them.  Id. 02368.

3   **J.    THE FINAL DENIAL**

4          57.    On August 5, 2008, Standard issued a final denial of Oster's claim.  Id. 01588 –

5   01600.  Standard admitted that it had incorrectly denied Oster benefits from July 7, 2004 to

6   May 31, 2005, but asserted that it was only obligated to pay Oster the minimum benefit amount

7   of $656.25 per month because Oster had failed to provide "satisfactory documentation of what

8   [his] income from work activity was during that period."  Id. 01589.  Standard further asserted

9   that Oster's attempt to return to work at Radical meant he was fully recovered and denied

10  benefits after May 31, 2005.  Id. 01444-1445, 01593-1594.  Moreover, Standard stated that

11  Oster has failed to provided financial information or "medical documentation of treatment [he]

12  may have received after May 2005 for any condition that was severe enough to preclude him

13  from working."  Id. 01593.  Standard also asserted that Plaintiff was not disabled because

14  website sources indicated that he participated in "Trek Races" in May 2006.  Id. 01594.

15         58.    In its August 5, 2008 denial letter, Standard asserted, for the first time, that the

16  examination findings of Dr. Floyd David Fortuin (a physician hired by the opposing party in

17  Oster's personal injury lawsuit related to the automobile accident) conducted in February 22,

18  2005 supported a finding that Oster was no longer disabled.  Id. 01597, 02339-2347.

19                          **CONCLUSIONS OF LAW**

20  **A.    LEGAL STANDARD**

21         59.    Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on

22  the facts without a jury..., the court must find the facts specially and state its conclusions of law

23  separately."  In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the

24  Court does not determine whether there is an issue of material fact, but actually decides

25  whether the plaintiff is disabled under the policy.  See Kearney v. Standard Ins. Co., 175 F.3d

26  1084, 1095 (9th Cir. 1999).  The Court is to "evaluate the persuasiveness of conflicting

27  testimony," and make findings of fact.  Id.  This is considered a "bench trial on the record,"

28

1   which may "consist[ ] of no more than the trial judge rereading [the administrative record]."

2   Id.

3         60.    In an ERISA action, the plaintiff carries the burden of showing, by a preponderance

4   of the evidence, that he was disabled under the terms of the Plan during the claim period.  See

5   Sabatino v. Liberty Life Assurance Co. of Boston, 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003);

6   Finley v. Hartford Life & Acc. Ins. Co., 2007 WL 4374417, at *7 (N.D.Cal. 2007).

7         61.    In this case, the Plan grants Standard discretion in considering disability claims.

8   However, Standard also funds the benefits provided under the Plan and makes the final

9   decision on appeal.  Standard, therefore, has a structural conflict of interest in its administration

10  of the Plan. Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 629-30 (9th Cir.

11  2009).  Accordingly, this Court "must take into account the administrator's conflict of interest

12  as a factor in the analysis."  Id. at 630.[3]

13        62.    "More particularly, the court must consider numerous case-specific factors,

14  including the administrator's conflict of interest, and reach a decision as to whether discretion

15  has been abused by weighing and balancing those factors together."  Id.

16        63.    "A court may weigh a conflict more heavily if, for example, the administrator

17  provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the

18  plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly

19  denied benefits to deserving participants by interpreting plan terms incorrectly or by making

20  decisions against the weight of evidence in the record."  Abatie, 458 F.3d at 968 -969 (internal

21  citations omitted).

22        64.    As explained by the Ninth Circuit in Montour:

23

24        [3] Oster filed Objections to and Requests to Strike Evidence Submitted by Defendants in
    Support of Defendants' Response to Plaintiff's Rule 52 Motion for Judgment.  Dkt. 63.  Oster

25  objects to the Declaration of Ronald Fraback, M.D. (Dkt. 49) and the Declaration of Micah
    Rubenstein (Dkt. 50), submitted by Defendants in support of their response to Oster's Rule 52

26  motion, on the ground that Defendants failed to disclose these individuals as witnesses under
    Federal Rule of Civil Procedure 26(a)(1)(A).  In response, Defendants argue that the omission

27  was harmless and substantially justified because they offered a Rule 30(b)(6) witness on the
    issue of conflict of interest, which is the issue addressed by these declarants.  The Court agrees

28  and DENIES Oster's request to strike.

Under this rubric, the extent to which a conflict of interest appears to have motivated an administrator's decision is one among potentially many relevant factors that must be considered.  Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts "with all of the relevant evidence[,]" and whether the administrator considered a contrary SSA disability determination, if any.

588 F.3d at 630.

65.     "The weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case.  For example, … this factor should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."  Id. at 630-631 (quoting Abatie, 458 F.3d at 967 (holding that in weighing a conflict of interest, the court's discretionary review must be "informed by the nature, extent and effect" that conflict may have had "on the decision-making process")).

66.     If a conflict of interest exists, "abuse of discretion review applies" and "that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  Id. at 631.  "If those facts and circumstances indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred."  Id.

**B.     ABUSE OF DISCRETION ANALYSIS**

67.     Applying those principles here, Standard's reliance on Dr. Dickerman, Dr. Toenniessen, and United Review Services to deny Oster's claim and maintain its denial warrants a high level of skepticism.  See e.g. Caplan v. CNA Fin. Corp., 544 F. Supp. 2d 984, 991-92 (N.D. Cal. 2008) (finding Hartford demonstrated a strong conflict of interest by relying

1  on a third party vendor UDC and peer medical reviewer "that Hartford knows benefits

2  financially from doing repeat business with it").

3        68.    In this case, Dr. Dickerman and Dr. Toenniessen benefited financially from

4  Standard's repeat business.  Similarly, it is clear that United Review Services was repeatedly

5  rewarded financially by Standard.  This evidence demonstrates that Standard failed to use a

6  "truly independent medical examiner or a neutral, independent review," as required by Abatie.

7  Abatie, 458 F.3d at 969 n.7.  Therefore, Standard's denial should be viewed with the high

8  skepticism.

9        69.    In addition, Standard improperly discounted the evidence submitted with Oster's

10  appeal regarding his disability, demonstrating an abuse of discretion.  Black & Decker

11  Disability Plan v. Nord, 538 U.S. 822 (2003) (refusal to credit reliable evidence constituted

12  abuse of discretion).  The ERISA regulations require that an administrator take "into account

13  all comments, documents, documents, records, and other information submitted by the claimant

14  relating to the claim, without regard to whether such information was submitted or considered

15  in the initial benefit determination."  29 C.F.R. § 2560.503-1(h)(2)(iv).

16        70.    The assertions of Dr. McMullen and Standard that Oster could not receive

17  disability benefits because he attempted employment at Radical further shows an abuse of

18  discretion, particularly in view information that Oster provided to Standard regarding his

19  demotion and ultimate termination.  Courts have held that an insurer cannot refuse or deny

20  disability benefits if a claimant is working, but remains disabled.  Hawkins v. First Union Corp.

21  Long-Term Disability Plan, 326 F.3d 914 (7th Cir. 2003) ("A disabled person should not be

22  punished for heroic efforts to work by being held to have forfeited his entitlement to disability

23  benefits should he stop working."); Seitz v. Metropolitan Life Ins. Co., 433 F.3d 647 (8th Cir.

24  2006) ("adopting MetLife's position would unfairly punish individuals who test their

25  limitations and attempt to keep working before seeking benefits.").

26        71.    Moreover, Standard's failure to consider whether Oster remained disabled from

27  his own occupation when he started to work for Radical is contrary to its own claims manual

28  procedures.  In Friedrich v. Intel Corp., 181 F.3d 1105 (9th Cir. 1999), the Ninth Circuit held

1   that an insurer's refusal to follow its own policies and procedures demonstrated the extent of

2   the insurer's conflict of interest.  Id. at 1110.  As discussed above, Standard's own claim

3   manual makes clear that if a claimant returns to work, Standard is still required to investigate

4   whether the claimant is disabled from performing the duties of his own occupation with

5   reasonable continuity.  See e.g. Dinh v. Standard Ins. Co, 2007 WL 2298319 at *8 (finding that

6   Standard abused its discretion by asserting the claimant was not disabled because she could

7   perform sedentary to light occupation, when it made no attempt to recognize the cognitive

8   demands of the claimant's position as a professional executive recruiter).  However, there is no

9   indication that Standard considered the evidence from Oster's failed employment at Radical as

10  probative evidence of his continued disability.

11       72.      Furthermore, Standard abused its discretion by ignoring the raw data of Dr.

12  McMullen's IME that showed that Oster had cognitive deficits that precluded his ability to

13  perform his own occupation with reasonable continuity.  Specifically, Dr. McMullen and

14  Standard ignored the results in the raw data that demonstrated that Oster suffered significant

15  cognitive deficits in reading recognition, spelling and math achievement, attention and

16  concentration and rapid processing speed.  See AR 00657 (low achievement in basic math

17  despite engineering background and high IQ); 00664 (weaker processing speed and working

18  memory than noted in May 2005).  Dr. Horstman's review of the IME report made clear the

19  extent of Oster's cognitive deficits, as he revealed Dr. McMullen's interpretation of the raw

20  data was flawed.  Id. 02297-2303.  Standard's failure to acknowledge its own evidence

21  supporting Oster's continued disability was an abuse of discretion.

22       73.      Additionally, Standard failed to provided a "full and fair review" of Oster's

23  claim by adding rationales for its denial over a three year period without providing Oster an

24  opportunity to respond.  Under ERISA, an administrator must provide a plan participant a "full

25  and fair review" of a participant's claim.  29 U.S.C. §1133(2).  In Abatie, the court held that

26  introducing a new rationale for the first time in a final decision violated the "full and fair

27  review" requirement:

28

> When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures. . . . Moreover a review of the reasons provided by the administrator allows for a full and fair review of the denial decision, also required under ERISA.  Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA.  This procedural violation must be weighed by the district court in deciding whether [the administrator] abused its discretion.

458 F.3d at 974 (citations omitted).

74.     Further evidence that Standard failed to engage in a full and fair review of Oster's claim includes its refusal to provide the raw data to Oster's counsel until six months after the IME has been conducted.  In addition, none of Standard's physician reviewers ever contacted or spoke with Oster's treating physicians to ascertain the current state of his condition.  Moreover, Standard made no attempt to obtain Oster's medical records from 2006 onward, nor did it make any attempt to contact his physicians after 2006, even though its decision was not rendered until two years later.  Finally, Standard's decision in August 2008 (four years after Oster initially filed his claim) to only pay the minimum benefit from July 7, 2004 to May 31, 2005 is further compelling evidence of the bias that Standard demonstrated during the claims process.

75.     Standard also failed to conduct a full and fair review of Oster's claim by relying on Dr. Dickerman during both the initial denial and the appeal process.  ERISA regulations provide:

> Appeal of adverse benefit determinations … the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures … [p]rovide that the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual <u>who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal</u>, nor the subordinate of any such individual.

29 C.F.R. § 2560.503-1(h)(3)(v)(4)(h) (emphasis added).

76.     In general, Standard did not comply with its obligation as an ERISA fiduciary to adhere to "higher-than-marketplace quality standards on insurers" or "discharge [its] duties" in respect to discretionary claims processing "solely in the interests" of Oster, its claimant.  See Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2345 (2008) (citing 29 U.S.C. § 1104(a)(1)).  Instead, its treatment of Oster as an adversary during the claims process casts doubt on the credibility of its decision on appeal.

## **CONCLUSION**

For the foregoing reasons,

IT IS HEREBY ORDERED THAT:

1.     Standard's claim decision is REVERSED.

2.     The parties shall meet and confer in an effort to reach a stipulation regarding the amount of benefits owed under the Policy, including consideration of any applicable offsets.

3.     By no later than October 29, 2010, the parties either shall submit such a stipulation, or shall each submit an additional brief, not to exceed five (5) pages (excluding any supporting declaration(s)), addressing the amount of benefits owed under the Policy.

4.     Defendants' Administrative Motion to File Portions of a Document Under Seal (Dkt. 45) and Plaintiff's Administrative Motion to File Exhibit E to the Declaration of Brian H. Kim and Plaintiff's Amended Rule 52 Motion for Judgment Under Seal (Dkt. 57) are GRANTED.

5.     Because this Order may contain information filed under seal by the parties, this Order shall remain under seal pending further Order of the Court.  By no later than October 29, 2010, the parties shall jointly advise the Court which facts, if any, they contend should be redacted from the public version of this ruling.  To the extent any party seeks redaction of any portion of the Court's ruling, such party shall provide the Court with the legal authority for such request and a proposed redacted order for public disclosure.

6.     This Order terminates Dkts. 29, 45, 66, 57, and 73.

///

///

1    IT IS SO ORDERED.

2    Dated: January 3, 2011

            _____
            SAUNDRA BROWN ARMSTRONG
3            United States District Judge